22 N.J. Super. 5 (1952)
91 A.2d 518
FRANK CARBONE, PLAINTIFF-APPELLANT,
v.
JACK C. WARBURTON, DEFENDANT-RESPONDENT
Superior Court of New Jersey, Appellate Division.
Argued August 4, 1952.
Decided October 6, 1952.
*8 Before Judges WAESCHE, HUGHES and FRANCIS.
Mr. Leo Rosenblum argued the cause for plaintiff-appellant.
Mr. Frederick C. Vonhof argued the cause for the defendant-respondent (Mr. William P. Braun, attorney).
The opinion of the court was delivered by FRANCIS, J.C.C. (temporarily assigned).
Appellant, Carbone, sued respondent, Warburton, a medical doctor, charging malpractice. At the trial Carbone offered one Dr. Sidney D. Jacobson, a New York physician, as an expert witness. After direct and cross-examination as to his qualifications, the trial court declared that he was not qualified and declined, on objection, to allow him to testify. Counsel then informed the court for the record that he intended to prove through the witness, by way of answer to certain hypothetical questions, that the defendant's treatment of Carbone "was not in accordance with the standards of skill, care and knowledge usually exercised by members of his profession." No other expert being produced, the action was dismissed for lack of proof of defendant's negligence. From the consequent judgment this appeal was taken.
The complaint recites that on July 21, 1946 appellant suffered a comminuted fracture of the left tibia and fibula about six inches above the ankle joint and that the defendant treated him on that day at St. Joseph's Hospital, Paterson, New Jersey. The specifications of negligence against him, as set out in the pretrial order, are that he malaligned the fracture and that he failed: (1) to remove infectious and other substances from the site of the fracture, thus causing *9 the soft tissues and bone to become infected, (2) to administer anti-tetanus treatments, (3) to irrigate the fracture properly, (4) to make proper inspections of the fracture, and (5) to "supervise" the injury properly after the leg was placed in a cast.
It is admitted that respondent is a licensed medical doctor of New Jersey and that he treated appellant for a fractured left leg. Beyond this admission the appendix before us does not disclose whether the treatment was administered in the capacity of general practitioner or specialist, and therefore we assume that it was given as a general practitioner.
Accordingly, what duty did Dr. Warburton owe Carbone? The law is clear that when a physician accepts a patient he is required to have and to exercise in the diagnosis and treatment the skill normal to the average member of the profession. Hull v. Plume, 131 N.J.L. 511 (E. & A. 1944); Lolli v. Gray, 101 N.J.L. 337 (E. & A. 1925); Gramaldi v. Zeglio, 3 N.J. Misc. 669 (Sup. Ct. 1925); Klitch v. Betts, 89 N.J.L. 348, 353 (E. & A. 1916); Policastro v. Lahnecker, 12 N.J.L.J. 269 (Sup. Ct. 1889); Smith v. Corrigan, 100 N.J.L. 267, 272 (Sup. Ct. 1924); Restatement of the Law  Torts, sec. 299 d; 41 Am. Jur., Physicians and Surgeons, sec. 82, p. 200; sec. 87, p. 205. In application this general rule may be related to the grade or class or type of physician involved without difficulty. If he is a general practitioner he must use in the care of his patient the skill normal to the average member of his profession practicing as such. Policastro v. Lahnecker, supra. On the other hand, one who holds himself out as a specialist must employ not merely the skill of a general practitioner, but also that special degree of skill normally possessed by the average physician who devotes special study and attention to the particular organ or disease or injury involved, having regard to the present state of scientific knowledge. Coleman v. Wilson, 85 N.J.L. 203 (E. & A. 1913); Hopkins v. Heller, 59 Cal. App. 447, 210 P. 975, 976 (Dist. Ct. App. 1922).
*10 When a physician is charged with negligence in the diagnosis or treatment of a patient's condition it must appear that he departed from the degree of skill required of him. And in order to demonstrate this ultimate fact two elements of proof are essential. First, those standards must be established which are generally recognized and accepted by the branch of the profession to which he belongs as the customary and proper methods of diagnosis or treatment of the physical or mental condition concerned in the inquiry. Secondly, a departure from such standards under circumstances justifying the conclusion of want of the requisite degree of care. Hull v. Plume, supra; Sinz v. Owens, 33 Cal.2d 749, 205 P.2d 3, 8 A.L.R.2d 757 (Sup. Ct. 1949) McGraw v. Kerr, 23 Colo. App. 163, 128 P. 870 (Ct. App. 1912); Anderson v. Chasney, 4 D.L.R. 458 (K.B. 1948); Adolay v. Miller, 60 Ind. App. 656, 111 N.E. 313 (App. Ct. 1916); Adkins v. Ropp, 105 Ind. App. 331, 14 N.E.2d 727 (Ind. App. Ct. 1938); Hill v. Parker, 122 P.2d 476, 12 Wash.2d 517 (Sup. Ct. 1942); Fritz v. Horsfall, 163 P.2d 148, 24 Wash.2d 14 (Sup. Ct. 1945); 7 Wigmore on Evidence, sec. 2090 (a), p. 453; Rogers, Expert Testimony, sec. 165.
The establishment of the standards of practice and departure therefrom is a matter for expert testimony, except in those unusual cases where the conduct required by the particular circumstances is within the common knowledge of laymen. Hull v. Plume, supra; Sinz v. Owens, supra; McGraw v. Kerr, supra; Anderson v. Chasney, supra; 7 Wigmore on Evidence, sec. 2090 (a), p. 453; Rogers, Expert Testimony, sec. 153, p. 361. It seems plain that what constitutes proper treatment is a medical question to be presented by experts and that neither the courts nor jurors can be permitted to say or to speculate as to what technique should be utilized for a certain disease or injury or how a specific surgical operation should be conducted. As the King's Bench put it in Anderson v. Chasney, supra, the courts "are dependent upon the medical profession for evidence of the proper routine, *11 treatments and technique." If no standard is established through medical witnesses, then the jury has no standard by which to gauge the basic issue of fault of the physician. McGraw v. Kerr, supra.
In this connection the need for expert testimony does not mean that the witness must be a specialist, although the fact that he is not may be taken into consideration in weighing his testimony. 54 A.L.R. 860, 861; Rogers, Expert Testimony, sec. 156, p. 365. "Expert" here means skilled, that is, that the witness possesses special knowledge and skill upon the subject matter about which he is called to testify. 20 Am. Jur., Evidence, sec. 784. And, of course, it has long been established that a person may qualify as an expert in this sense through actual experience or theoretical knowledge based upon special study of the subject. Rogers, Expert Testimony, sec. 176, p. 384; 20 Am. Jur., Evidence, secs. 783, 784.
The appeal in the present case must be appraised in the light of these fundamental and controlling principles. Appellant urges that the action of the trial court in rejecting his expert medical witness as unqualified and in dismissing the action was erroneous for two reasons. Primarily the claim is that when a person meets the statutorily prescribed educational standards of a state and is licensed to practice medicine by the proper authorities, as a matter of law he automatically becomes qualified and competent to testify in any field of medicine or surgery, and the weight of his testimony is for the jury to determine. Secondly, it is asserted that if the trial court had the discretionary power to pass upon the qualifications of the witness, consideration of all the facts demonstrates that he was guilty of a mistaken use of that discretion.
To support the first argument reference is made to Castner v. Sliker, 33 N.J.L. 507 (E. & A. 1869), Young v. Stevens, 132 N.J.L. 124 (E. & A. 1944), and McGhee v. Raritan Copper Works, 133 N.J.L. 376 (Sup. Ct. 1945). These cases indicate that our courts have shown a marked liberality *12 in dealing with the competency of medical witnesses to testify as to the relation between trauma, occupational hazards and the like, and alleged results thereof.
In Castner v. Sliker, supra, a treating physician, who was a general practitioner, was held qualified to give an opinion as to the manner in which a certain eye injury could be caused, the Court of Errors and Appeals saying:
"The witness said he was a physician. This, in common parlance, means one skilled in both medicine and surgery. The statute of this state on the subject, requires that anyone receiving a license to practice as a physician and surgeon shall be skilled both in medicine and surgery and in anatomy. If the witness was a physician in these acceptation of the term, he was an expert in the very matters required for this opinion, anatomy and surgery. The question was legal and proper."
To substantially the same effect is Young v. Stevens, supra, and McGhee v. Raritan Copper Works, supra, expounds the doctrine that a general practitioner, who is versed in the field of neurology, is competent to advance an opinion as to the relation between an accident and a traumatic neurosis, even though he is not a specialist. The inability to qualify as a specialist goes to the weight of the testimony and not to its competence.
However, there is no case in New Jersey to the effect that mere possession of a license to practice medicine without more renders the holder competent to express an opinion in an action based upon damage resulting from alleged negligent care or treatment of a patient by a physician. And in our judgment the rule represented by the cases to which reference has just been made cannot be extended to such an action. The reason seems obvious. As already pointed out, in malpractice cases proof of the standards recognized and applied by the medical profession in the situation under investigation must be introduced, as well as proof of such a deviation therefrom as would warrant a determination of culpability. This evidence can come only from one who, through experience or study or both, knows the standards. Therefore, a *13 showing of such knowledge is a prerequisite to the competency of the proffered medical witness.
We agree with the view taken by Wigmore (sec. 2090 (a)) that:
"On any and every topic, only a qualified witness can be received, and where the topic requires special experience, only a person of that special experience will be received. If therefore a topic requiring such special experience happens to form a main issue in the case, the evidence on that issue must contain expert testimony, or it will not suffice.
Now, such an issue is rarely found. Generally the topics on which only an expert witness can be received form usually but one element in the main issuable fact. Moreover, generally the parties are eager enough to produce such expert testimony without any rule to require them. It happens, however, that in one class of cases, viz., actions against a physician or surgeon for malpractice, the main issue of the defendant's use of suitable professional skill may be a topic calling for expert testimony only * * *.
Here the courts have been obliged to insist on the dictate of simple logic, resulting from the principle above cited, that expert testimony on the main fact in issue must somewhere appear in the plaintiff's whole evidence; and for lack of it the court may rule in its general power to pass upon the sufficiency of evidence that there is not sufficient evidence to go to the jury."
We find in the decisions throughout the country in medical malpractice actions frequent references to the difficulties of proof faced by a tortiously injured patient, and to the "well known" reluctance of the members of the medical profession to testify for such a patient. For example, in Tadlock v. Lloyd, 65 Colo. 40, 173 P. 200, 202 (Colo. Sup. Ct. 1918), the court said:
"* * * The code of ethics among physicians is frequently a bar to securing positive testimony on questions such as here involved. As was said in Johnson v. Winston, 68 Neb., at p. 430, 94 N.W. at page 609:
`We cannot overlook the well known fact that in actions of this kind it is always difficult to obtain professional testimony at all. It will not do to lay down the rule that only professional witnesses can be heard on questions of this character, and then in spite of the fact that they are often unwilling, apply the rules of evidence with such stringency that their testimony cannot be obtained against one of their own members.'"
*14 No reference has been made to any canon of ethics in New Jersey which proscribes the giving of testimony by one physician against another. And, however mindful we are of the problem of proof, the proposed rule of evidence which would qualify as an expert witness in a medical malpractice case any holder of a license to practice medicine, without further proof of his knowledge of the particular subject and of the standard of conduct by which his fellow practitioner's liability should be tested, would not represent a just appraisal of the interests involved. It is not a sufficient answer to say that once the possession of a license is established the weight of the statements of the witness is for the jury to determine. For, as already indicated, the legal duty of the physician must be measured by some legal standard. It must be tested by some competent evidence so that the jury may have before it a proper gauge by which it can determine whether his acts or omissions constitute a neglect or omission of duty. Adolay v. Miller, supra.
In our State the determination of the issue of the qualifications of a witness to testify as an expert has always rested in the discretion of the trial court, and his ruling with respect thereto will not be disturbed on appeal unless erroneous as a matter of law or so clearly the result of an unreasonable evaluation of the facts as to constitute a mistaken use of discretion. Hager v. Weber, 7 N.J. 201 (1951, concurring opinion, p. 214); Schuttler v. Reinhardt, 17 N.J. Super. 480 (App. Div. 1952); Healey v. Billias, 17 N.J. Super. 119, 122 (App. Div. 1951); Coll v. Bernstein, 14 N.J. Super. 71 (App. Div. 1951).
Relating this rule specifically to the type case before us, for purposes of disposition of the second phase of appellant's argument, we hold that in considering the competency of a proffered expert medical witness who is a licensed physician, a trial court should have regard for the proof difficulties adverted to, and to the fundamental concept that where a right exists the law would be deficient if there were no remedy for violation of that right, and consequently *15 should exercise his discretion liberally toward the acceptance of the qualifications. Where there is any reasonable evidence of qualification in addition to the license, he should be permitted to testify. Cross-examination will expose any weakness in or limitations on his knowledge and experience. And then the weight to be accorded his testimony may be left where it has rested traditionally, namely, with the jury.
In the present case the record discloses that the rejected medical witness was 82 years of age at the time of the trial and had been licensed to practice in New York for many years. He graduated from Tulane University with a Medical Doctor degree in 1890. While at the university he attended the Charity Hospital and saw a number of compound comminuted fractures of the leg. He observed the manner in which they were treated and rendered some assistance to the treating physicians. Upon graduation he went to Australia for a time and then went to England where he remained three years studying surgery. While there, among other things, he studied under "one of the biggest orthopedic surgeons in the world." He underwent successfully an examination before the Royal College of Surgeons of England and was given a diploma as a member of that Royal College. Then he studied pathology and urology in Berlin for six months and advanced surgical obstetrics in Vienna for a like additional period. He returned to New York City about 1905 and became the first assistant in the laboratory of the Post-Graduate Hospital there. In the ensuing years he was assistant gynecologist at the Mount Sinai Hospital, worked in the same field, that is, gynecology and surgery relating thereto, at the Sydenham Hospital, and as associate gynecologist at St. Mark's Hospital, all in the same city. He was also visiting surgeon to the Maternity Hospital in New York City, and consulting surgeon to the Home for the Aged and Infirm in Yonkers, New York, and to the Institution for Adolescent Delinquents in Pleasantville, New York. The memory of the witness, perhaps because of his age, was not *16 as specific as it might have been with respect to the dates and periods of these various connections.
The doctor continued to practice in New York City until about "1928, 1929 or 1930" when he suffered a heart attack which confined him to bed for three months. This brought about a restriction of his activities. He resigned from the New York Academy of Medicine of which he had been a Fellow; also from membership in the American Medical Association which he had held for 30 years. Exactly what the nature of his practice was after the illness is not clear from the evidence. He said he was not "physically able to go on with operative work and all that. So now, of course, I am still practicing medicine but mostly office work, because I don't think it would be fair for me to do operative work at my age." Prior to the trial he had not performed an operation for over 20 years. However, he had visited the various hospitals in New York City about 10 or 15 times a year to observe operations, although no such visits had been made for about a year. He asserted that he kept abreast of medical and surgical progress by reading. He had a substantial medical library of his own and studied the various works "quite assiduously"; in addition, he studies the medical journals, such as the Journal of the American Association of Military Surgeons and a weekly publication known as New York Medicine, which is published by the American Medical Association; and he frequently visits the library of the Academy of Medicine in New York City for purposes of study.
On cross-examination it appeared that while he had neither treated nor observed the treatment of fractures in 1946 he knew what the method of treatment was and he knew what was being done in hospitals in 1946 for fractures. This knowledge came from his reading and study of books and medical journals. On being asked, he furnished the names of the authorities whose books he had read on the subject. These statements stand unqualified and uncontradicted.
*17 As we already pointed out, a person can become an expert through actual experience or study or through both. This record presents a witness of substantial educational background in his profession and many years of practice. While it is true that he is not a specialist in the field of orthopedics he asserted knowledge of the method of treatment of fractures both in hospitals and generally and supported the assertion by the specific references to which we have adverted. In refusing to allow him to testify, in effect the trial court declared that he had no qualifications that would render him competent as an expert. In the light of the evidence on the subject and the requirement of liberal appraisal thereof, the rejection of the witness was erroneous and constituted a mistaken use of discretion. In the situation presented he should have been permitted to testify and the weight of his statements left for the jury to determine.
The judgment is reversed and a new trial ordered.
WAESCHE, J.S.C. (temporarily assigned; dissenting).
This is a suit for malpractice. The plaintiff was treated by the defendant for a fracture of the leg.
The question involved in this appeal, as stated in the brief of the plaintiff-appellant, is: "Did the trial court commit error in refusing to permit a licensed physician of the State of New York to testify as an expert on behalf of the plaintiff."
The witness, Sidney D. Jacobson, was 82 years of age. He is not licensed to practice in New Jersey and he has not shown any knowledge of the practice followed in New Jersey (or, for that matter, the practice followed in any other place) in the reduction and treatment of a fracture.
The witness testified that he graduated from Tulane Medical College, New Orleans, Louisiana, in 1890, and that as an undergraduate at Tulane he saw a number of compound comminuted fractures of the leg at the Cook County Hospital (Charity Hospital) and took part in the treatment of some. After graduating from Tulane the witness went to *18 Australia where he sought to obtain a license to practice medicine, but a license was refused him there on the ground that his medical education was insufficient. The evidence does not show how long he remained in Australia. The witness testified that after returning from Australia he started to practice in New York, but he did not produce his license in court. He did not say when he obtained his license to practice in New York, but he said he began practicing in New York between 1890 and 1892; he had forgotten the exact date. At another point in his testimony he said that he started practicing in New York after he returned from Vienna in 1904 or 1905.
The witness testified that he went to London, England, in 1901 and studied there for three years in Guy's Hospital. There is no information in the record concerning Guy's Hospital, nor what the witness studied there. He said that he passed an examination and thereby became a member of the Royal College of Surgeons of England. The evidence does not disclose the subjects covered by the examination. From London the witness went to Berlin and studied pathology, urology and surgery. After that he went to Vienna and studied obstetrics for six months. He returned to New York in 1904 or 1905 and obtained a position in the pathological laboratory of the Post-Graduate Hospital, which he held for three years. He did not treat any fractures there, nor did he do any surgery there. He also held a position in the gynecological division of the Mount Sinai Hospital, New York, but the evidence does not indicate for how long, nor the character of his work there, except that he did no surgery. In 1906, or 1907, or 1908, he said that he became associate gynecologist at the Sydenham Hospital, New York, where he remained for about five years. Still later he became associate gynecologist at the St. Mark's Hospital. Then he became visiting surgeon to the Maternity Hospital in New York City, consulting surgeon to the Home of the Aged and Infirm in Yonkers, and consulting surgeon at the Institution *19 for Adolescent Delinquents in Pleasantville, New York.
In 1928 he suffered a heart attack and was confined to bed for three months. His testimony regarding his practice, if any, and his medical or surgical experience, if any, after 1928 is very vague and uncertain, except that he has not practiced any surgery in over 20 years.
The defendant is charged: (1) with the malalignment of the segments of a fracture of the left tibia and fibula, (2) with the failure to remove infectious and other substances from the area of the fracture, and (3) with the improper treatment of the said injury.
The plaintiff contends that the witness possesses the experiential capacity to testify concerning the skill and care required in New Jersey for the proper treatment of each of the foregoing matters, and, therefore, that he is fitted to answer hypothetical questions addressed to him on all or any of those points. The attorney for the plaintiff said:
"The questions that are involved in this case, not only effect fractures, but the questions involve biology; they involve bacteriology, they involve all sorts of branches of medicine. They don't involve only fractures. There are five or six branches of medicine involved here, so that under the circumstances, it is much better to produce a witness who is familiar with many branches of medicine, rather than just one branch of medicine. However, the witness has qualified, I submit, with respect to all of these branches of medicine that I speak of."
The plaintiff was treated at the St. Josephs Hospital in Paterson, New Jersey, for a fracture of the left tibia and fibula. The witness was, therefore, required to be familiar with the skill in the treatment and care of a fracture exercised by practitioners in good standing in Paterson, or in similar localities. In the case of Warnock v. Kraft, 30 Cal. App.2d 1; 85 P.2d 505 (Dist. Ct. App. 1939) the court said:
"The law is established in California that in a malpractice case to qualify a physician as an expert it must be shown that the witness *20 possesses learning and knowledge of the subject under inquiry sufficient to qualify him to speak with authority on the subject, and also a familiarity with the treatment and degree of care and skill of other practitioners in the locality in question sufficient to qualify him to testify whether or not the treatment furnished the plaintiff was consistent with what other physicians in the same community in the exercise of reasonable care would do under similar circumstances."
See, also, Bickford v. Lawson, 27 Cal. App.2d 416; 81 P.2d 216 (Dist. Ct. App. 1938).
In the case of Michael v. Roberts, 91 N.H. 499; 23 A.2d 361 (Sup. Ct. 1941) the court said:
"Dr. Domizio Costa, a surgeon residing in Revere, Massachusetts, was called by the plaintiff as an expert and was asked certain questions as to the propriety of the treatment in this case and the possibility of other treatment. These questions were excluded by the Presiding Justice as a matter of discretion, subject to the plaintiff's exception. It cannot be said as a matter of law that there was error in these rulings. Although Dr. Costa resided in Revere, Massachusetts, a city on the evidence comparable in size to Rochester, he testified that his practice was largely in Boston, and it was properly to be found that he was really a Boston surgeon. Since `a person who holds himself out as practicing a particular profession is only required to possess the knowledge and to exercise the care and skill of the ordinary practitioner of that profession in the same place or in similar localities,' (April v. Peront, 88 N.H. 309, 188 A. 457, 458) the opinion of a Boston surgeon as to what Dr. Roberts might or ought to have done was not receivable."
The foregoing rule is also stated as the general rule in 32 C.J.S. 263, sec. 537, and in 70 C.J.S. 950, sec. 43.
The trial judge found: (1) that Sidney D. Jacobson had not actively practiced his profession for many, many years; (2) that he had not had any hospital experience or training for many years; and (3) that there is nothing to indicate that he has had any experience except during the course of his early training. The trial judge said:
"The issue presented in this case by the pleadings, and by testimony offered by the plaintiff, is such that this witness, in my humble opinion, could not qualify himself as an expert in the field in which this inquiry is directed. Therefore I conclude that this witness is not qualified to testify in this case as an expert."
*21 In the case of Sinz v. Owens, 33 Cal.2d 749, 205 Pac.2d 3 (Sup. Ct. 1949), the court said that an expert witness
"must have had basic educational and professional training as a general foundation for his testimony, but it is a practical knowledge of what is usually and customarily done by physicians under circumstances similar to those which confronted the defendant charged with malpractice that is of controlling importance in determining competency of the expert to testify to the degree of care against which the treatment given is to be measured."
In 2 Wigmore, Evidence (3rd ed. 1940), section 569, it is stated that an expert witness on a medical topic should possess such qualifications as the community daily and reasonably relies upon in seeking medical advice.
"The possession of the required qualifications by a particular person offered as a witness, must be expressly shown by the party offering him." 2 Wigmore, Evidence (3rd ed. 1940), section 560.
In the case of New Jersey Zinc Co. v. Lehigh Zinc Co., 59 N.J.L. 189 (E. & A. 1896), the court said:
"Who is entitled to be considered as an expert in regard to any question of science or skill cannot be determined by any precise rule, but from the nature of the case must be left very much to the discretion of the trial judge, and his decision is conclusive unless clearly shown to be erroneous in matter of law."
In the case of State v. Arthur, 70 N.J.L. 425 (Sup. Ct. 1904), the court said:
"The question whether a given witness has the necessary special experience to qualify him to give opinion evidence is a question of fact for the determination of the trial court. The authorities agree that the admission of a witness thus to testify as an expert is largely in the discretion of the trial court, and that its decision is final unless shown to be erroneous in law. If there be any legal evidence to support it the finding is not erroneous in law, and is not reviewable on common law writ of error."
In the case of Cowdrick v. Pennsylvania R.R. Co., 132 N.J.L. 131 (E. & A. 1944), the court said:
*22 "Whether a witness is to be considered an expert in regard to any question of science or skill must, from the nature of the case, be left very much to the discretion of the trial judge, and his decision is conclusive unless clearly shown to be erroneous in matter of law."
In the case of Canonico v. Celanese Corp. of America, 11 N.J. Super. 445 (App. Div. 1951), the court said:
"We find no merit in plaintiff's second ground of appeal, viz.: that the court erred in excluding the testimony of the expert witness Shelanski. Where, as here, the question as to whether a witness has such special knowledge or experience as to justify him to give opinion evidence, is one for the discretion of the trial court, his decision is conclusive unless clearly shown to be erroneous in matter of law."
In the case of Bosze v. Metropolitan Life Ins. Co., 1 N.J. 5 (1948) the court said:
"The control of the proof at the trial was in the discretion of the trial judge and his decision as to the qualifications of an expert witness was conclusive unless clearly erroneous as a matter of law."
See, also, Rempfer v. Deerfield Packing Corp., 4 N.J. 135 (1950); Essex County Park Comm. v. Brokaw, 107 N.J.L. 110 (E. & A. 1930); Ringwood Co. v. North Jersey, etc., Comm., 105 N.J.L. 165 (E. & A. 1928); Leonard v. Standard Aero Corp., 95 N.J.L. 235 (E. & A. 1920); Ross v. Com'rs of Palisades Interstate Park, 90 N.J.L. 461 (Sup. Ct. 1917).
In 20 Am. Jur. 749, sec. 891, it is stated that,
"whether the witness is properly qualified is a question addressed primarily to the sound discretion of the trial judge, and his action will not be reviewed in the absence of a showing that he has abused that discretion."
In the case of Bratt v. Western Air Lines, Inc., 155 F.2d 850 (C.C.A. 10 1946), the court said:
"Whether a witness called to testify to any matter of opinion has such qualifications and knowledge as to make his testimony admissible, is a preliminary question for the judge presiding at the trial, *23 and his decision of it is conclusive, unless clearly shown to be erroneous as a matter of law." (Citing a long list of cases)
This court is required, on a review of any cause involving an issue of fact not determined by the verdict of a jury, to give due regard to the opportunity of the trial court to judge of the credibility of the witness. Rules 1:2-20(a), 4:2-6. The determination of the qualifications of a witness to testify as an expert is a fact question. The trial court considered the credibility of the evidence before arriving at its findings of fact.
The American Law Institute's Model Code of Evidence states the well settled law as follows:
"A witness is an expert witness and is qualified to give expert testimony if the judge finds * * * that the witness has the requisite special knowledge, skill, experience or training." (Rule 402).
In 2 Wigmore on Evidence (3d ed. 1940), sec. 561, the author says that, in view of many considerations:
"it cannot be doubted that the rule of the future ought to be:
The experiential qualifications of a particular witness are invariably determined by the trial judge, and will not be reviewed on appeal."
In my opinion the action of the trial judge should not be disturbed. The appeal should, therefore, be dismissed, and the judgment affirmed.